WERNER v. HEARST.

(Supreme Court, Appellate Division, Second Department. November 21, 1902.)

1. SERVANT—NEGLIGENCE—IDENTITY OF MASTER—QUESTION FOR JURY.
    In an action for injury from the negligence of a servant, the evidence examined, and *held* to present a question for the jury as to whether defendant, or a corporation of which he was a stockholder, was the employer of the servant.

2. SAME—INJURIES—CAUSE—QUESTION FOR JURY.
    In an action for personal injuries, *held*, that under the evidence the question as to whether plaintiff's physical condition at the time of trial was the result of her alleged injuries was properly submitted to the jury.

3. SAME—FALSE TESTIMONY—REVERSIBLE ERROR—AGE OF PLAINTIFF.
    Where, in an action for personal injuries, it did not appear that plaintiff's testimony as to her age was material except as affecting her veracity, a misstatement by her with respect thereto was not ground for reversal, unless willfully, intentionally, or falsely made; the subject being fairly before the jury.

4. PLEADING—AMENDMENT AT TRIAL—OBJECTION—WAIVER.
    Where defendant stated that he was surprised by plaintiff's motion on trial for permission to amend the complaint, but did not move for a continuance or postponement, he could not except to the granting of the amendment.

Appeal from trial term, Westchester county.

Action by Melle S. T. Werner against William R. Hearst for personal injuries. From a judgment for plaintiff, and from an order denying defendant's motion for new trial, he appeals. Affirmed.

Argued before GOODRICH, P. J., and BARTLETT, JENKS, WOODWARD, and HIRSCHBERG, JJ.

Clarence J. Shearn (B. F. Einstein, on the brief), for appellant.
Roger M. Sherman, for respondent.

GOODRICH, P. J. The complaint alleged the following facts: On May 14, 1897, the defendant was owner and publisher of a newspaper, and in and about the business of distributing and transporting employed a wagon known as "No. 47," and a driver named Polhemus. On that day the plaintiff was riding a bicycle on one of the city streets, when the wagon was negligently driven into collision with the plaintiff, whereby she suffered great bodily injuries, which incapacitated her from pursuing her natural and accustomed vocation and from child-bearing. At the trial the court allowed an amendment alleging that the plaintiff was a counselor at law and a lecturer in a law school,

and that by the accident she was incapacitated from pursuing her said occupation, had been subjected to great expense for medical treatment, and that her disability would be permanent. Defendant denied that on May 14, 1897, he was owner or publisher of a newspaper, or that in or about the business of distributing or transporting it he employed or was the owner of the vehicle No. 47, or the employer of Polhemus. Defendant's brief contains the statement that "issue was joined on the question of the ownership of the newspaper and of the wagon and of the employment of the driver, and also on the genuineness of the plaintiff's alleged injuries"; and it makes no argument as to the negligence of either party, so the question whether the negligence of the driver caused the injuries and whether the plaintiff was guilty of contributory negligence need not be considered, leaving for discussion only the question of the ownership of the newspaper and vehicle, the employment of the driver by the defendant, and the genuineness and extent of the plaintiff's injuries. The plaintiff recovered a verdict of $25,000, and the defendant appeals.

The first question relates to the ownership of the newspaper and wagon and the employment of the driver. At the close of the entire evidence the defendant moved for a dismissal of the complaint on the ground that there was no evidence showing that the defendant was the owner of the wagon or the employer of the driver, and, as the court denied the motion, and submitted the question to the jury, it is well to state with considerable detail the facts proven, in order to ascertain whether or not there was sufficient evidence to support the verdict. It is claimed by the plaintiff that, while the business was conducted nominally under the cover of corporate forms, the defendant was the actual proprietor, being the owner of all the stock except some nominal holdings by his employés to qualify them to hold corporate office; that he directed and controlled the business and the policy of the several newspapers hereinafter referred to, and was in fact the owner at the time of the accident. The evidence discloses the following facts: Albert Pulitzer and others, in 1882, under the manufacturing corporation act of February 17, 1848, filed a certificate of incorporation of the Morning Journal Association, the object of which was stated to be to print, publish, and sell a newspaper under the name of "The Morning Journal." In 1888 Watkins and others filed another certificate of incorporation of the Star Company, the object being stated to be the printing, publishing, and selling of newspapers. On March 30, 1897, Clark and others filed another certificate of incorporation of the New York Evening Journal Publishing Company, the object of which was to print, publish, and distribute a newspaper or newspapers, and to buy, acquire, and deal in all articles necessary to print, publish, and distribute the same. Upon the sides of the wagon which collided with the plaintiff were painted the words "New York Journal" and "Number 47." It was one of twenty purchased from Studebaker by a written order headed "The Journal Circulation Department," and signed "The New York Journal, per S. J. Richardson, Circulation Manager," and paid for by a check headed "New York Journal," and signed "New York Journal, by C. M. Palmer." Mr. Earl, cashier of the Nassau Bank, testified

that the New York Journal had kept an account in that bank for about four years. (The trial began April 4, 1901.) The money was drawn on checks signed in print "New York Journal" and in writing underneath by H. N. Bicknell and E. W. Clark or W. Thompson. Neither the defendant, the Morning Journal Association, the Star Company, nor the Evening Journal Publishing Company had any other account in the bank. The method of dealing with the bank account is shown by several letters. One is dated March 5, 1897, addressed to the Nassau Bank, and reads:

"Regarding the account of the Morning Journal appearing in your bank, to the credit of which we wish to renew deposits and accounts, will you kindly honor such accounts when signed as per margin.
"Yours very truly,                                     C. M. Palmer, Treasurer.
     "By New York Journal.
     "By Harry M. Bicknell, Accountant.
     "By W. B. Palmer, Cashier."

The date of the first deposit was March 10, 1897. Two subsequent letters, headed "New York Journal. W. R. Hearst," and dated, respectively, November 22, 1898, and May 19, 1900, and signed "Henry M. Bicknell, Cashier New York Journal," changed the required signatures in some respects. In September, 1900, a fund for the relief of the Galveston flood sufferers was instituted, of which the defendant was treasurer. Three checks are in evidence, given by subscribers to this fund to the order of "New York Journal," and one to the order of "Wm. R. Hearst." These checks were indorsed, "Pay to the Nassau Bank of N. Y., or order, W. R. Hearst, N. Y. Journal Galveston Relief Fund," and were deposited in the bank account already referred to. A copy of the New York Evening Journal dated May 14, 1897, was also put in evidence, on the first and last pages of which were the words: "New York Journal. Evening. New York, Friday, May 14, 1897. The Evening Journal. W. R. Hearst." There was also in evidence a certificate of the state comptroller that there was no record in his office of reports filed by the Morning Journal Association, the New York Evening Journal Publishing Company, or the Star Company from November, 1895, to March, 1901. Also a certificate of the county clerk of New York county that there was not filed in his office up to January, 1901, any annual report of the Star. Company; that annual reports of the Morning Journal were filed in January, 1895, 1896, 1901, and of the New York Evening Journal Publishing Company in January, 1901.

The plaintiff contended that this was sufficient evidence to support her claim that the defendant was the actual owner of the several newspapers and of the wagon No. 47, and employer of its driver. Neither the defendant, nor the driver, who was present in court at the trial, nor Palmer, nor Bicknell was called by the defendant as a witness. But Mr. Carvalho, who was one of the incorporators of the New York Evening Journal Publishing Company, was called by the defendant. He testified that he was the "general manager of the New York Journal and Das Morgen Journal"; that his original connection with the Morning Journal Association was made in April, 1896; that it was engaged in printing the Morning Journal, the New York

Morning Journal, and Das Morgen Journal; that the New York Evening Journal was started in September, 1896; that the Evening Journal was published in 1896, and was owned and distributed by the Morning Journal Association up to April 3, 1897; that the Morning Journal was printed and distributed by the Morning Journal Association up to April 1, 1897; that the name was changed during 1896 to the New York Journal. On March 29, 1897, the Morning Journal Association, by order of the board of directors, Mr. Hearst being then president, and executing the bill of sale, in consideration of $1 transferred to Edward H. Clarke "the newspaper known as and called the 'Evening Edition of the New York Journal,'" with all its property; and Clarke, in consideration of $9,500, on April 3d, transferred the same to the New York Evening Journal Publishing Company. On October 12, 1895, at a meeting of the directors of the Morning Journal Association, Mr. Macklin, the former president of the company, resigned, and Mr. Hearst was elected as his successor. On April 1, 1897, at a special meeting of the Morning Journal Association, the defendant being present as president and one of the stockholders, a resolution was passed that the newspaper the New York Journal and all the property and assets of the company except Das Morgen Journal be transferred to the Star Company in consideration of $1, and confirming the transfer of the New York Journal to Clarke; and on April 11th the bill of sale was executed by Mr. Hearst, as president of the Morning Journal Association, and Mr. Clarke, as president of the Star Company. It appears that of the 300 shares of $500 each of the Morning Journal Association Mr. Hearst was on the minutes of the meeting stated to be the owner of 366 [sic], and Palmer and Chamberlain 1 share each. The defendant also produced the minutes of the directors' meeting of the Star Company of April 1, 1897, at which Mr. Hearst was present, in which appears a resolution authorizing the purchase from the Morning Journal Association of the "New York Journal and all the assets of the Morning Journal Association except Das Morgen Journal, for the consideration of one dollar and other valuable considerations, and that the president be authorized to execute the bill of sale; and further ratifying a sale to Stillman & Hubbard of all the assets of the company except the Morning Advertiser and its good will and the contract with the Associated Press,—the consideration of such sale being the agreement by Stillman & Hubbard to indemnify the company against all debts existing April 1, 1897. On April 1, 1897, by resolution of the directors of the Star Company, the name of the journal known as the "Morning Advertiser" was changed to "New York Journal and Advertiser," and on April 3d Mr. Clarke resigned his office as president and trustee, and Mr. Hearst was elected as his successor. Mr. Hearst owned all the stock of the Star Company, the Morning Journal Association, and the Evening Journal Publishing Company, except six or eight shares. Mr. Carvalho testified that after April 1, 1897, the copies of the Evening Journal Association were distributed by the Star Company in wagons which that company had purchased from the Morning Journal Association on that date; that prior to that date the drivers were employed by the Morning Journal Associa-

tion, and afterward by the Star Company; that prior to that date
the Morning Journal Association deposited its receipts of money in
two banks—the Wells, Fargo & Co. Bank and the Nassau Bank—
under the name of the New York Journal; that after that date they
were deposited by the Star Company, but in the Wells, Fargo & Co.
Bank in the name of the New York Journal, and in the Nassau Bank
in the name of the Morning Journal Association; that the wages
of the drivers were paid by the Star Company out of the Wells, Fargo
& Co. Bank account. It also appears that at the first meeting of the
directors of the Morning Journal Association a resolution was passed
authorizing the issue of one-half of the stock of the company to Mr.
Pulitzer for his services preliminary and preparatory to the issuing of
the Morning Journal, and for his services as manager and conductor
for a period of 10 succeeding years; that is, for services not then ren-
dered and which might have been terminated by the death or disability
of Mr. Pulitzer at any time within the 10 years. This stock, or its
equivalent, or other representative stock in the later companies is a
portion of that held by the defendant. No dividends have ever been
declared by either of the corporations, although there have been at
times profits which have been used in a sinking fund or in the im-
provement of the plant. Up to 1899, when the defendant was presi-
dent, he borrowed money to the extent of several hundred thousand
dollars for the use of the papers in some way, but in what way or
from, or by whom, is not disclosed. It does not appear when he
became connected with the enterprise, nor in what capacity, except
that in October, 1895, he was elected president of the Morning Jour-
nal Association.

This evidence raised a fair question of fact as to the identity of the
real owner of the newspaper which was being published at the time
of the plaintiff's injury and the employer of Polhemus, the driver,
and this question was very fully stated by the court and submitted to
the jury. Whatever might have been the purpose of the compli-
cated transactions in the issues of stock of the several companies and
the transfer of their properties, it is evident that the transactions
have resulted in great doubt, and have confused the real with the
apparent ownership. The indiscriminate use of the bank account for
the several newspapers and for the Galveston relief fund, the absence
of any explanation, the failure to call the defendant to explain the
transactions by which he acquired his interest in the business, and
the failure to call the driver, who was in court, and other persons
intimately connected with the affairs, as witnesses to these transac-
tions, might well give rise to a fair inference that their testimony
would have been against the defendant's interest, and in favor of the
plaintiff, on these questions. People v. Hovey, 92 N. Y. 554. The
rule is well stated in Brown v. Schock, 77 Pa. 477, 478, where it was
said:

"The effectiveness of any proof to sustain the contention of the party pro-
ducing it always depends, in a measure, on the proof which it was in the power
of the party to produce. He who withholds some evidence, while introducing
proof of a less satisfactory character, raises a presumption that the part which
he has withheld would not sustain, but would rather tend to contradict, the
evidence which he has offered. A case, therefore, which would otherwise be

strong, may be rendered weak, and practically unproven, by the fact that proof of a higher grade, which might have been produced, was withheld."

Under such circumstances, the denial of a nonsuit on this ground, and the submission of this question to the jury, was eminently proper.

The other main question relates to the genuineness and extent of the plaintiff's injuries; that is, whether her condition at the time of the trial was the immediate and necessary result of the accident. Upon this subject there was much medical and other testimony. Plaintiff and her witnesses gave evidence tending to show that among the injuries resulting from the accident was a broken patella. No mention of this seems to have been made to her physicians at the time of the accident, nor until many months afterwards; but there was testimony as to some injuries' to the knees, and the course of the evidence was such as to enable the jury to infer that the patella was injured, or, indeed, wholly broken, by her fall. So, also, there was evidence tending to show that a diseased condition of the genital organs resulted from the accident, and that in a surgical operation, which plaintiff claimed to be consequent upon the fall, it became necessary to remove the ovaries and uterus. Fibroid tumors also were found in these parts. The defendant gave expert testimony tending to show that such tumors could not have been occasioned by the accident and the injuries received therefrom, but it does not appear that the removal of the organs was consequent solely upon the presence of these tumors. Again it is to be said that there was a fair question of fact for the jury upon this whole subject. Plaintiff also testified that she was never pregnant to her knowledge. She was married in June, 1896, and in the following winter she and her husband consulted a physician, Dr. Laidlaw, for a serious uterine trouble, and an operation was performed, which resulted in the removal of a four-months foetus. She was under anæsthetics during the operation, and was never informed that she had been found in a pregnant condition. Defendant claims that this abortion accounted for much of her condition after the accident, and that most of her suffering and illness resulted therefrom. There was evidence that before the accident she was in good health, and that after the accident she was never restored to her original condition. Here again was contradictory evidence presenting a fair question for the jury.

Defendant claims that the plaintiff testified falsely as to her age. At the commencement of her examination and on her cross-examination she testified that she was 27 years of age at the time of the accident, and 31 at the time of the trial, in 1901, making the date of her birth to have occurred in 1870; that she was a teacher in one of the public schools in 1893, 1894, and 1895. The defendant produced the school records, showing that she entered the normal school in 1877, giving her age as 16, whereas, if actually born in 1870, she would have been but 7 years of age at that time; and that she was a teacher in one of the public schools from 1881 to 1896. It does not appear that the question of age is material as bearing upon the extent of her injuries, or, indeed, in any other aspect of the case, except as to her veracity. Moreover, there is a grave question whether these records were admissible. Buffalo Loan, Trust & Safe

Deposit Co. v. Knights Templar & Masonic Mut. Aid Ass'n, 126 N. Y. 458, 27 N. E. 942, 22 Am. St. Rep. 839. She was admitted to the bar in 1894; was a lecturer in the law school of the New York University in 1895 and 1896. Even if she incorrectly testified as to her age, that was a subject fairly before the jury, who heard her testimony, and noted her appearance, and such a mistake, unless shown to be willfully, intentionally, or falsely made, hardly justifies a reversal of the judgment.

The other questions of the plaintiff's general health before, and her condition after, the accident were fully presented to the jury by the evidence. A careful and repeated examination of the voluminous record does not bring us to the conclusion that the verdict was against the weight of evidence.

There was no error in permitting the plaintiff to amend her complaint to set up special damages sustained by her in her professional capacity. While it is true that such a motion should usually be made at special term, it is not necessarily error to permit such an amendment at the trial. When the motion was made, the defendant's counsel stated that they were surprised, but did not move for a continuance or postponement of the trial. They chose to proceed, and, having done so, are precluded from a valid exception to the permission to amend. See Witrak v. Railroad Co., 52 App. Div. 234, 238, 65 N. Y. Supp. 257.

In Edge v. Railroad Co., 57 App. Div. 29, 67 N. Y. Supp. 1002, cited by defendant's counsel, the plaintiff moved to amend by setting up the necessity of employing a person to do his work while plaintiff was incapacitated by the accident under investigation. Defendant's counsel expressed his surprise, and asked to withdraw a juror, and the request was refused. Besides, there had been a bill of particulars as to items of damage, in which no mention of such services was made, and there was at the trial no evidence that the amount paid for the services was a fair compensation. Under those circumstances we held that such an amendment at the trial was improper. In the present case there was an allegation in the original complaint that the plaintiff was incapacitated from "performing her natural and accustomed avocations" [sic], and the amendment may be considered only as amplification of that allegation.

We have considered the exceptions to the admission and exclusion of testimony and the single exception to the charge argued in defendant's brief, but fail to find in any of them any reversible error. The judgment should be affirmed.

Judgment and order affirmed, with costs. All concur.